#30117-aff in pt & rev in pt-SRJ
**2023 S.D. 40**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PEGGY A. DETMERS,                                    Plaintiff and Appellant,

     v.

KEVIN COSTNER,                                       Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ERIC J. STRAWN
Judge

* * * *

ANDREW R. DAMGAARD of
Woods, Fuller, Shultz & Smith, P.C.
Sioux Falls, South Dakota

A. RUSSELL JANKLOW of
Johnson, Janklow & Abdallah, LLP
Sioux Falls, South Dakota                           Attorneys for plaintiff
                                                 and appellant.


STACY R. HEGGE
CATHERINE A. SEELEY of
Gunderson, Palmer, Nelson & Ashmore, LLP
Pierre, South Dakota

* * * *

                                                    ARGUED
                                                    MARCH 22, 2023
                                                    OPINION FILED **08/02/23**

* * * *

DANIEL E. ASHMORE of
Gunderson, Palmer, Nelson & Ashmore, LLP
Rapid City, South Dakota

Attorneys for defendant
and appellee.

#30117

JENSEN, Chief Justice

[¶1.]     In the early 1990s, Kevin Costner commissioned Peggy Detmers to create 17 large, bronze sculptures of buffalo and Lakota warriors on horseback to display at The Dunbar, a luxury resort Costner planned to build on property he owned near Deadwood, South Dakota.  Detmers commenced litigation against Costner in 2008, after The Dunbar had not been built, alleging that Costner was required to sell the sculptures and split the profits with Detmers pursuant to the terms of a prior written agreement (Agreement) because the parties had not agreed on an alternative location for display of the sculptures.  The circuit court rejected Detmers' claim and found that the parties had agreed to permanently display the sculptures at Tatanka, another project Costner developed on some of the same property where The Dunbar was to be built.  This Court affirmed.  *Detmers v. Costner*, 2012 S.D. 35, 814 N.W.2d 146 (*Detmers I*).

[¶2.]     In 2021, Detmers brought the current action against Costner, alleging that his sale-listing for Tatanka constituted an anticipatory breach of the agreement to permanently display the sculptures at Tatanka.  In the alternative, Detmers sought a declaratory judgment that selling the Tatanka property and relocating the sculptures would trigger Costner's obligation to sell the sculptures under the terms of the Agreement.  The parties filed cross motions for summary judgment.  The circuit court granted summary judgment in favor of Costner and denied Detmers' motion.  Detmers appeals.  We affirm in part, reverse in part, and remand.

## Factual and Procedural History

[¶3.] In 1994, Detmers began her work on the sculptures pursuant to an oral agreement with Costner. By 2000, believing progress had not been made toward developing The Dunbar, Detmers refused to finish the sculptures. Costner and Detmers negotiated and entered into the Agreement on May 5, 2000. As part of the Agreement, Costner agreed to pay Detmers additional compensation, clarified Detmers' royalty rights on reproductions of the sculptures, and provided her with certain rights regarding the display of the sculptures.

[¶4.] The parties' arguments in this appeal focus on three paragraphs of the Agreement:

> 2. Although I will be the sole owner of all rights in the sculptures, including the copyright, in the sculptures, you will always be attached through your royalty participation. Because I believe that the sculptures are a valuable asset, I feel strongly that it is important that you maintain your 20% of gross retail price royalty on future sales of fine art reproductions (5% of gross retail price royalty on mass market reproductions selling for under $200). However, should you desire to sell that interest to me at some point in the future, I would be happy to discuss that with you in good faith.
>
> 3. Although I do not anticipate this will ever arise, if The Dunbar is not built within ten (10) years or the sculptures are not agreeably displayed elsewhere, I will give you 50% of the profits from the sale of the one and one-quarter life scale sculptures after I have recouped all my costs incurred in the creation of the sculptures and any such sale. The sale price will be at [or] above standard bronze market pricing. All accounting will be provided. In addition, I will assign back to you the copyright of the sculptures so sold (14 bison, 3 Lakota horse and riders).
>
> 4. We will locate a suitable site for displaying the sculptures if The Dunbar is not under construction within three (3) years after the last sculpture has been delivered to the

mold makers.  In the meantime, until the sculptures are put on display, I will permit you to market and sell reproductions and you can retain eighty percent 80% of the gross retail sales price and pay 20% to me.  Once the sculptures are put on public display in public view, agreed upon by both parties (but with the final decision to be made by me if we do not agree), the percentages will reverse, 80% of the gross retail sales price to me and 20% to you.  The marketing must proceed as outlined below.

[¶5.]    Costner and Detmers began looking for alternative locations to display the sculptures in 2002, after the sculptures were completed but construction on The Dunbar had not started.  Costner eventually suggested permanently displaying the sculptures on a portion of the property originally intended to be part of The Dunbar.  This project came to be known as Tatanka and included a visitor center, gift shop, cafe, interactive museum, and nature walkways to accompany the sculptures.

[¶6.]    In 2008, Detmers sued Costner, seeking an order requiring Costner to sell the sculptures and disburse the sale proceeds consistent with paragraph three of the Agreement.  She alleged that this provision of the Agreement had been triggered because The Dunbar had not been built and the sculptures were "not agreeably displayed elsewhere[.]"  She claimed she had not agreed to the permanent display of the sculptures at Tatanka in the absence of The Dunbar and that Tatanka was not "elsewhere" under the terms of the Agreement.  In response, Costner argued he had spent millions of dollars to develop Tatanka and that he and Detmers agreed to permanently place the sculptures at Tatanka, as an alternate location for the display of the sculptures under paragraph three.

[¶7.]    The trial in *Detmers I* commenced more than ten years after the parties executed the Agreement.  Although The Dunbar had not been built, the

circuit court found that Detmers and Costner had agreed to permanently display the sculptures at Tatanka. The court concluded that the sculptures were "agreeably displayed elsewhere" as Tatanka constituted "elsewhere" under the unambiguous terms of the Agreement. Based upon this determination, the circuit court denied Detmers' claim that Costner was required to sell the sculptures pursuant to paragraph three of the Agreement and expressed that Costner had "fully performed under the terms of the [Agreement]." Detmers appealed the decision, arguing that she only agreed to the location because she had been promised The Dunbar would still be built. This Court affirmed, holding that "[t]he circuit court did not err or make any clearly erroneous factual findings in determining that the sculptures are 'agreeably displayed elsewhere,' in the absence of a guarantee from Costner that The Dunbar would be built." *Id.* ¶ 24, 814 N.W.2d at 151.

[¶8.] In the decade that followed, Detmers continued to receive royalties from replicas of the sculptures sold at Tatanka. Meanwhile, construction on The Dunbar never began, and Costner sold all the property surrounding Tatanka that had been intended for The Dunbar. In the fall of 2021, Costner listed the real estate upon which Tatanka is located for sale online. The listing expressly excluded the sculptures from the sale and indicated that they "will be relocated by seller."

[¶9.] In November 2021, Detmers brought the current action, claiming the real estate listing and statement concerning the relocation of the sculptures constituted an anticipatory breach of the agreement to display the sculptures at Tatanka. Detmers also included a count for declaratory judgment asking the court to determine her rights under the Agreement and specifically to determine that

closing Tatanka or relocating the sculptures from Tatanka would trigger Costner's obligation to sell the sculptures and assign the copyright to Detmers.

[¶10.] The parties filed cross motions for summary judgment, and the circuit court heard oral arguments on the motions. Detmers argued that Costner was required by *Detmers I* to permanently maintain the sculptures at Tatanka and that his decision to move them was an anticipatory breach of the agreement to permanently display the sculptures at Tatanka as a matter of law. Costner argued that Detmers' claim was barred under the doctrine of res judicata because *Detmers I* fully resolved all the issues involving the parties' obligations under the Agreement. Alternatively, Costner argued that he had fully performed under the terms of the Agreement after the parties agreed to locate the sculptures "elsewhere" and that he was not obligated to maintain the sculptures at Tatanka. He also argued the claims for anticipatory breach were not ripe.

[¶11.] The circuit court granted Costner's motion for summary judgment based upon res judicata, and alternatively, based on its determination that the reference to the "permanent" display of the sculptures in *Detmers I* did not obligate Costner to continue to display the sculptures at Tatanka in perpetuity. The court also determined that the "agreeably displayed elsewhere" language in the Agreement did not "constitute a continuing right or obligation" and that once the parties agreed to display the sculptures at Tatanka, Costner fully performed his obligations under the Agreement. Detmers appeals, raising three issues which we state as follows:

> 1. Whether the circuit court erred in concluding Detmers' claims are barred by the doctrine of res judicata.

2.  Whether the circuit court erred in its interpretation of the Agreement and in holding Costner was discharged from any further performance under the Agreement.

3.  Whether the circuit court erred in denying Detmers' motion for summary judgment that Costner anticipatorily breached the agreement to permanently display the sculptures at Tatanka as a matter of law.

## Standard of Review

[¶12.]    "We review a circuit court's entry of summary judgment under the de novo standard of review." *Healy Ranch, Inc. v. Healy*, 2022 S.D. 43, ¶ 17, 978 N.W.2d 786, 793, *reh'g denied* (Sept. 19, 2022) (quoting *Estate of Stoebner v. Huether*, 2019 S.D. 58, ¶ 16, 935 N.W.2d 262, 266).  "Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.  If there exists any basis which supports the ruling of a trial court, affirmance of a summary judgment is proper." *Id.* (quoting *Du-Al Mfg. Co., a Div. of SOS Consol., Inc. v. Sioux Falls Const. Co.*, 487 N.W.2d 29, 31 (S.D. 1992)).  "The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party." *Id.* (quoting *Du-Al Mfg. Co.*, 487 N.W.2d at 31).  However, the non-moving party has the burden to "present specific facts which demonstrate a genuine, material issue for trial." *Id.* (quoting *Du-Al Mfg. Co.*, 487 N.W.2d at 31).

## Analysis and Decision

### 1.    *Res Judicata*

[¶13.]    "Res judicata consists of two preclusion concepts: issue preclusion and claim preclusion." *Id.* ¶ 40, 978 N.W.2d at 798 (quoting *Am. Family Ins. Grp. v. Robnik*, 2010 S.D. 69, ¶ 15, 787 N.W.2d 768, 774).  "Issue preclusion refers to the

effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Id.* (quoting *Robnik*, 2010 S.D. 69, ¶ 15, 787 N.W.2d at 774). "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit[.]" *Id.* (alteration in original) (quoting *Robnik*, 2010 S.D. 69, ¶ 15, 787 N.W.2d at 774). "What is prohibited . . . under claim preclusion is the cause of action itself, but under issue preclusion, it 'is the particular issue or fact common to both actions.'" *Id.* ¶ 41, 978 N.W.2d at 798 (quoting *Bollinger v. Eldredge*, 524 N.W.2d 118, 122 (S.D. 1994)).

[¶14.]     For an action to be barred by res judicata, four elements must be satisfied:

> (1) the issue in the prior adjudication must be identical to the present issue, (2) there must have been a final judgment on the merits in the previous case, (3) the parties in the two actions must be the same or in privity, and (4) there must have been a full and fair opportunity to litigate the issues in the prior adjudication.

*Id.* ¶ 42, 978 N.W.2d at 799 (quoting *Dakota, Minn., & E.R.R. Corp. v. Acuity*, 2006 S.D. 72, ¶ 17, 720 N.W.2d 655, 661). We apply these elements "under both issue preclusion and claim preclusion theories." *Id.* ¶ 43, 978 N.W.2d at 799. "However, as it relates to claim preclusion, . . . . 'our review is *not* restricted to whether the specific question posed by the parties in both actions was the same or whether the legal question posed by the nature of the suit was the same.'" *Id.* ¶ 44, 978 N.W.2d at 799 (quoting *Farmer v. S.D. Dep't of Revenue & Regul.*, 2010 S.D. 35, ¶ 10, 781 N.W.2d 655, 660). "For purposes of [claim preclusion], a cause of action is comprised of the facts which give rise to, or establish, the right a party seeks to

enforce. The test is a query into whether the wrong sought to be redressed is the same in both actions." *Id.* ¶ 45, 978 N.W.2d at 799 (alteration in original) (quoting *Glover v. Krambeck*, 2007 S.D. 11, ¶ 18, 727 N.W.2d 801, 805). "If the claims arose out of a single act or dispute and one claim has been brought to a final judgment, then all other claims arising out of that same act or dispute are barred." *Id.* (quoting *Farmer*, 2010 S.D. 35, ¶ 10, 781 N.W.2d at 660).

[¶15.] Costner asserts that Detmers' current action is precluded by res judicata because Detmers seeks to relitigate the "not agreeably displayed elsewhere" language of the Agreement and because *Detmers I* affirmed the circuit court's determination that Costner "has fully performed" under the terms of the Agreement after the parties agreed to place the sculptures at Tatanka. Detmers concedes elements two and three of res judicata are satisfied but argues that the issues are not the same in the two cases. She asserts that the only issues determined in *Detmers I* were (1) whether Detmers agreed to the placement of the sculptures at Tatanka in the absence of the resort and (2) whether the Tatanka location constituted "elsewhere" under the terms of the Agreement.

[¶16.] Detmers argues the current dispute involves Costner's anticipatory breach of the agreement to permanently display the sculptures at Tatanka by stating his intention to unilaterally relocate the sculptures from Tatanka—or, otherwise, his intended action will trigger his obligation to sell the sculptures under the Agreement. She maintains that the facts and issues in this dispute were never before the court in *Detmers I* and were not capable of being litigated at that time. Detmers claims that she has not had a full and fair opportunity to litigate the

parties' rights in the Agreement now that Costner intends to move the sculptures from Tatanka.

[¶17.]        Unlike *Detmers I*, the current dispute between Detmers and Costner centers around the parties' rights and obligations under the Agreement *after* the parties agreed to display the sculptures at Tatanka. In particular, the parties disagree whether Costner has any remaining obligation under the Agreement to sell the sculptures, split the sale proceeds, and return the copyright to Detmers if he unilaterally relocates the sculptures from the agreed location at Tatanka. In *Detmers I*, "[t]he sole issue at the bench trial was whether the sculptures were 'agreeably displayed elsewhere'" when they were placed at Tatanka. 2012 S.D. 35, ¶ 7, 814 N.W.2d at 149. The rights and obligations of the parties in the location and display of the sculptures, after they were agreeably displayed at Tatanka, were not litigated or decided in *Detmers I*.

[¶18.]        Claim preclusion is also inapplicable because there is no showing that Detmers knew or should have known Costner would seek to relocate the sculptures from Tatanka. *Detmers I* did not discuss or even acknowledge the possibility that Costner might decide to relocate the sculptures in the future, nor was there any determination whether Detmers would have any rights under the Agreement in the event the sculptures were no longer displayed at Tatanka. Rather, Costner alleged in *Detmers I* that the parties had agreed to permanently display the sculptures at Tatanka. The facts giving rise to this action did not occur until years after the prior action and appeal were concluded. The issue "sought to be redressed" is not the same and did not arise, along with the prior claim, "out of a single act or dispute

. . . ." *See Healy Ranch, Inc.*, 2022 S.D. 43, ¶ 45, 978 N.W.2d at 799 (citations omitted). We conclude the circuit court erred in holding that Detmers' claims are barred by the doctrine of res judicata.

### 2. Obligations under the Agreement

[¶19.] Detmers argues that because The Dunbar was not built within ten years, paragraph three of the Agreement includes an ongoing obligation for the sculptures to be "agreeably displayed elsewhere." She also claims that Costner's stated intention to sell Tatanka and relocate the sculptures is an anticipatory repudiation of the agreement found in *Detmers I* to permanently display the sculptures at Tatanka and requires the sculptures to be sold and the copyright transferred to Detmers pursuant to paragraph three of the Agreement. She also maintains that if Costner unilaterally sells Tatanka and moves the sculptures from Tatanka, this is an event triggering paragraph three of the Agreement, requiring the sculptures to be sold and the profits split. She argues that this position is supported by a plain reading of the Agreement and by the language providing her with ongoing royalty rights on all reproductions of the sculptures.

[¶20.] The circuit court adopted Costner's assertion that his obligations under paragraph three of the Agreement could "be satisfied in one of two ways: (1) The Dunbar is built within ten years . . . or (2) the sculptures are agreeably displayed elsewhere within that time frame." Under this reading, Costner argues the circuit court correctly reasoned that he had satisfied all his contractual duties and had no further obligation under the Agreement after "the sculptures had been agreeably displayed elsewhere at Tatanka within that ten-year time frame[.]" Costner claims this construction of the Agreement is consistent with the circuit court's

determination in *Detmers I* that "Costner has fully performed under the terms of the [Agreement]."

[¶21.]     The circuit court concluded that any discussion in *Detmers I* that the sculptures would be permanently located at Tatanka did not prevent Costner from relocating them. In the briefs, the parties devote considerable attention to the definition of "permanent" in the context of the implied agreement referenced by the circuit court in *Detmers I*. Detmers' anticipatory repudiation claim is primarily premised on her argument that the circuit court in *Detmers I* found an implied agreement existed and that this implied agreement requires Costner to permanently display the sculptures at Tatanka. However, the current dispute is controlled by the express terms of paragraph three of the Agreement and whether Costner can relocate the sculptures from Tatanka without triggering the sale provision of the Agreement, not by any implied agreement found by the court in *Detmers I*. "[W]here there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise." *J. Clancy, Inc. v. Khan Comfort, LLC*, 2021 S.D. 9, ¶ 27, 955 N.W.2d 382, 391 (quoting *Koopman v. City of Edgemont by Dribble*, 2020 S.D. 37, ¶ 20, 945 N.W.2d 923, 928). "[A]n express contract precludes the existence of a contract implied by law or a quasi-contract." *Id.* (alteration in original) (quoting *Jurrens v. Lorenz Mfg. Co. of Benson, Minn.*, 1998 S.D. 49, ¶ 6, 578 N.W.2d 151, 153).

[¶22.]     "'Contract interpretation is a question of law' reviewed de novo." *Detmers I*, 2012 S.D. 35, ¶ 20, 814 N.W.2d at 151 (citation omitted). "When

interpreting a contract, '[a court] looks to the language that the parties used in the contract to determine their intention.'" *Id.* (citation omitted). "When the words of a contract are clear and explicit and lead to no absurd consequences, the search for the parties' common intent is at an end." *Id.* (quoting *Nelson v. Schellpfeffer*, 2003 S.D. 7, ¶ 8, 656 N.W.2d 740, 743). Courts "may neither rewrite the parties' contract nor add to its language[.]" *Id.* ¶ 21, 814 N.W.2d at 151 (quoting *Culhane v. W. Nat'l Mut. Ins. Co.*, 2005 S.D. 97, ¶ 27, 704 N.W.2d 287, 297). "Because we can review the contract as easily as the trial court, there is no presumption in favor of the trial court's determination." *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 2006 S.D. 6, ¶ 14, 709 N.W.2d 350, 354 (quoting *Cowan v. Mervin Mewes, Inc.*, 1996 S.D. 40, ¶ 6, 546 N.W.2d 104, 107).

[¶23.]    Consistent with *Detmers I*, we determine that the controlling language of the Agreement is unambiguous. *See id.* (quoting *Pesicka v. Pesicka*, 2000 S.D. 137, ¶ 6, 618 N.W.2d 725, 726) ("When the meaning of contractual language is plain and unambiguous, construction is not necessary."). Under the plain language of the Agreement, the circuit court erroneously read "not agreeably displayed elsewhere" to expire after ten years. This reading of the language in paragraph three and the conclusion that Costner had fully satisfied his obligation thereunder conflict with the rules of grammar in extending the ten-year time period for building The Dunbar to "not agreeably displayed elsewhere[.]" In the first sentence of paragraph three, the phrase "within ten (10) years" immediately follows the word "built" and is separated from the word "displayed" by the conjunction "or[.]" As a result, "within ten (10) years" modifies only "built[.]" Conversely, "displayed" is not affected by

"within ten (10) years[.]" Thus, the plain language of paragraph three establishes that "not agreeably displayed elsewhere" is not limited by time or duration.

[¶24.] The portion of paragraph three addressing what would happen if The Dunbar was not built within ten years, or the sculptures were not agreeably displayed elsewhere, specifies conditions that would trigger Costner's contractual obligation to sell the sculptures, split the profits, and assign the copyright for the sculptures to Detmers. We determine whether a condition precedent exists from "[t]he document as a whole" and whether the parties intended to agree "that the happening or nonoccurrence of the stated event after the contract becomes binding would cause the contract to terminate without further duties or obligations on either party." *Weitzel v. Sioux Valley Heart Partners*, 2006 S.D. 45, ¶ 38, 714 N.W.2d 884, 896. "A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties. A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. If the condition is not fulfilled, the right to enforce the contract does not come into existence." *Id.* ¶ 38, 714 N.W.2d at 895 (quoting *Johnson v. Coss*, 2003 S.D. 86, ¶ 13, 667 N.W.2d 701, 705–06). Paragraph three imposes a contingent obligation upon Costner to sell the sculptures, divide the profits with Detmers, and return the copyright to Detmers upon the occurrence of two conditions precedent: "Although I

-13-

do not anticipate this will ever arise, *if* [these conditions occur], I will give you . . . ."

(Emphasis added.)

[¶25.]       The Dunbar was not built within ten years, meeting the first of two conditions necessary to trigger the sale clause. The second condition is that "the sculptures are not agreeably displayed elsewhere[.]" In *Detmers I*, this condition was not met, and thus Costner's obligation to sell the sculptures in paragraph three was not triggered. As discussed above, however, the Agreement places no time limit on when the second condition may be satisfied or the obligation triggered thereby.

[¶26.]       This reading of paragraph three of the Agreement is consistent with our reading of the language in *Detmers I*. In *Detmers I*, we stated, "[u]nder paragraph three, Detmers would only be entitled to specific performance if The Dunbar was not built or the sculptures were not 'agreeably displayed elsewhere.'" 2012 S.D. 35, ¶ 10, 814 N.W.2d at 149. *See also id.* ¶ 21, 814 N.W.2d at 151 ("The plain words of the contract unequivocally provide that if The Dunbar was not built or the sculptures were not agreeably displayed elsewhere, then Detmers would be entitled to the relief described in paragraph three.").

[¶27.]       "It is a fundamental rule of contract interpretation that the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably." *Prunty Constr., Inc. v. City of Canistota*, 2004 S.D. 78, ¶ 16, 682 N.W.2d 749, 756 (citation omitted). Paragraph two provides that Costner will be the sole owner of the sculptures but also provides Detmers with ongoing royalties for the sale of reproductions. It states that "it is important that you maintain your 20% of gross retail price royalty on future sales of fine art

reproductions[.]" These terms provide Detmers with a continuing interest in the location and display of the sculptures because the value of the royalty payments is integrally related to whether the sculptures are displayed at a location likely to attract visitors and result in more sales of reproductions. If "the sculptures are not agreeably displayed elsewhere," the contingency provision for the sale of the sculptures ensures that Costner recovers the costs he incurred in the sculptures' creation, both parties share in any profits from the sale of the sculptures, and Detmers retains the copyright for the sculptures.

[¶28.] Conversely, paragraph four applied during the time between three years after the last sculpture was delivered to the mold makers without construction having begun on The Dunbar and ten years from the date of the Agreement without The Dunbar having been built. This provision gave Costner the power to make a final decision about an interim location for display of the sculptures. Thereafter, paragraph three, which has applied since ten years passed without The Dunbar being built, requires the sale of the sculptures unless the parties are in agreement about the display location.

[¶29.] Contrary to the circuit court's reasoning in this action, the circuit court's conclusion in *Detmers I* that Costner "has fully performed" was not a judicial determination that Costner had no further obligation under the Agreement. Rather, it was a determination that Costner was not obligated to sell the sculptures because the sculptures' placement at Tatanka was "elsewhere" and "the sculptures *are* 'agreeably displayed elsewhere[.]'" 2012 S.D. 35, ¶ 24, 814 N.W.2d at 151 (emphasis added). Nothing in the prior litigation released Costner from the

-15-

provisions and obligations under paragraph three of the Agreement. Since the condition that "the sculptures are not agreeably displayed elsewhere" is ongoing, Costner's decision to unilaterally sell Tatanka and relocate the sculptures would trigger the sale clause in paragraph three of the Agreement unless the parties agree to another display location.

[¶30.] The circuit court erred in its conclusion that Costner had no remaining obligation under paragraph three of the Agreement after the parties agreed to display the sculptures at Tatanka.

### 3. *Anticipatory Breach*

[¶31.] Detmers alleges that the circuit court erred in denying her motion for summary judgment on her claim for anticipatory repudiation by Costner. She argues that Costner's online real estate listing for the Tatanka property was an unequivocal statement that Costner intended to breach his obligation to display the sculptures at Tatanka and that the circuit court should have found, as a matter of law, Costner's breach of the Agreement. Costner responds that Detmers has failed to establish an anticipatory repudiation, as a matter of law, based upon the sale listing.[1]

[¶32.] "An anticipatory breach of a contract or anticipatory repudiation is 'committed before the time when there is a present duty of performance and results

---

1.  Costner also argues that Detmers' action should be dismissed because her claims are not ripe. Detmers' claims are ripe because a real controversy exists as to the rights and obligations of the parties under the Agreement in the event Costner unilaterally moves the sculptures from Tatanka and as to whether Costner's actions to date rise to anticipatory breach. *See Boever v. S.D. Bd. of Acct.*, 526 N.W.2d 747, 750 (S.D. 1995) (holding that a declaratory judgment action "is sufficiently ripe if the facts indicate imminent conflict").

from words or conduct indicating an intention to refuse performance in the future.'"
*Union Pac. R.R. v. Certain Underwriters at Lloyd's London*, 2009 S.D. 70, ¶ 39, 771
N.W.2d 611, 621 (quoting 23 Williston on Contracts § 63:29 (4th ed. 2000)). "A
breach of contract caused by a party's anticipatory repudiation, *i.e.*, unequivocally
indicating that the party will not perform when performance is due[,] allows the
nonbreaching party to treat the repudiation as an immediate breach of contract and
sue for damages." *Id.* ¶ 39, 711 N.W.2d at 621–22 (alteration in original) (quoting
*Weitzel*, 2006 S.D. 45, ¶ 31, 714 N.W.2d at 894).

[¶33.]     The condition that "the sculptures are not agreeably displayed
elsewhere" does not impose any obligation on the parties beyond the implied duty of
good faith and fair dealing. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841
(S.D. 1990) ("Every contract contains an implied covenant of good faith and fair
dealing which prohibits either contracting party from preventing or injuring the
other party's right to receive the agreed benefits of the contract."). Thus, Costner's
real estate listing for the sale of Tatanka does not—and the sale of the Tatanka real
estate in itself would not—breach any contractual obligation under the Agreement.
The potential sale of Tatanka merely foreshadows the possibility that the obligation
on Costner to sell the sculptures, split the profits, and assign the copyright will be
triggered unless the parties otherwise agree to the location for the display of the
sculptures.[2] When ten years passed without The Dunbar being built, the first

---

2.     In responding to Detmers' claim for anticipatory repudiation, Costner cites
Detmers' statement in *Detmers I* that she "has not agreed and will not agree
to an alternative permanent location for the [sculptures]" and argues this
constituted an anticipatory breach of the Agreement by Detmers. The circuit

(continued . . .)

condition was met. In determining that the parties agreed to display the sculptures at Tatanka, *Detmers I* recognized that the second condition had not been met. The second condition may still be satisfied, however, if and when the sculptures are no longer agreeably displayed—that is, if Costner sells the Tatanka property or moves them from Tatanka to another location without Detmers' agreement.

[¶34.] While Costner has admitted he still intends to sell Tatanka, this at most signals that his contingent obligation to sell the sculptures may vest. *See Weitzel*, 2006 S.D. 45, ¶ 38, 714 N.W.2d at 895 (explaining that there is no right to performance until condition precedent occurs). Even if Costner sells Tatanka or unilaterally relocates the sculptures from Tatanka to a place not agreeable to Detmers, such an action would not breach his obligation under the Agreement. Instead, this event would satisfy the second condition in paragraph three of the Agreement, triggering the obligation to sell the sculptures, split the profits, and transfer the copyright to Detmers. At present, Costner owes Detmers no obligation with respect to the display or sale of the sculptures that she can enforce against him. *See Union Pac. R.R.*, 2009 S.D. 70, ¶ 39, 771 N.W.2d at 621–22 (explaining that nonbreaching party may seek immediate relief only when repudiating party unequivocally indicates its intent to refuse to perform a duty when it becomes due in the future). For these reasons, Detmers has failed to establish Costner

---

(. . . continued)
court adopted this reasoning as an alternative ruling in this action. However, this is inconsistent with the circuit court's finding in *Detmers I* that Detmers had in fact agreed to the display at Tatanka.

anticipatorily breached the terms of the Agreement as a matter of law, and the circuit court properly denied Detmers' motion for summary judgment on this claim.

## Conclusion

[¶35.] We affirm the circuit court's denial of Detmers' motion for summary judgment on the question of anticipatory breach by Costner. We reverse the circuit court's entry of summary judgment for Costner. We remand Detmers' claims for further proceedings consistent with this opinion.

[¶36.] KERN, DEVANEY, and MYREN, Justices, and BARNETT, Circuit Court Judge, concur.

[¶37.] BARNETT, Circuit Court Judge, sitting for SALTER, Justice, who deemed himself disqualified and did not participate.